Good morning. We have four cases today. We'll call our first Wright v. Superintendent. Good morning, Your Honors. Aaron Fickus for Petitioner Appellant Douglas P. Wright. I'd like to please reserve three minutes for rebuttal time. That's grand. Thank you. Mr. Wright has been incarcerated for nearly two decades. Based on a theory that he shook, or shook and struck, his infant son on May 12th. But based on current medical understandings, Mr. Wright would not be convicted if he were tried today. This appeal involves three issues. Is that conceded? Does the government say, oh, well, our experts really were so wrong? I don't believe that's conceded, no. But we haven't heard from the experts based on contemporary medical understandings. All we have from the Commonwealth are the experts' testimony. Before we get to the nature of the testimony and whatever differences there may be between the testimony of one of the witnesses at one trial and his testimony at another trial and the current condition of the science, we've got a procedural default issue here, don't we, that we have to address? Certainly. You argued that you raised your freestanding innocence claim before the state court, right? That's correct. Did the state court expressly decide a freestanding innocence claim framed that way? It did not, no. As to your point about the procedural default, the Commonwealth agrees at pages six and seven of its brief that Mr. Wright presented his freestanding claim of actual innocence as to Dr. Plunkett's report and expert testimony. That's far and away the most important evidence supporting Mr. Wright's freestanding claim of actual innocence. Mr. Figgis, why wasn't that fairly presented to the state courts? The record reflects that you asserted that the legal and factual basis for those claims, and albeit different courts, as to your arguments on Dr. Plunkett and McManaway, the state court had the opportunity to address those. So why wasn't an actual innocence claim, or at least its substantial equivalent, fairly presented? Judge Cross, I completely agree. I think for the reasons you just stated, that that claim was fairly presented. Now, as we point out in our brief- So there is no default, but because the court didn't rule on it, didn't address it, that affects the standard of review, correct? That's exactly right, Your Honor. As to the standard of review, though, I'd like to take a step back. To be clear, we're challenging the factual findings made by the state courts. So it's essentially inconsequential now whether ad pediferens applies or whether it doesn't, because even if it doesn't, Section 2254E1 does apply. So Mr. Wright does have the burden to rip out factual findings by clearing convincing evidence. Right. As to the standard that applies to freestanding claims of actual innocence- It's a pretty tough standard. It is indeed, Your Honor. How do you meet it? That's correct. Well, one meets it- Assuming, of course, the metaphysical issue in this case, which is, is there such a thing as a freestanding actual innocence claim? That's correct, Your Honor, and I'd be happy to address that if you have any specific questions. Not at this point. Frankly, I don't have anything to add to that point besides what we have in our brief, and I think that covers that issue at least as well as I possibly can. As to the standard that applies to such claims, we urge this court to adopt the rule that it's the petitioner's burden to affirmatively prove that he is probably innocent. Now, this requires more than reasonable doubt, which would be sufficient for a gateway claim, but it does not require 100 percent certainty. How could that be met here, then, if in House v. Bell the Supreme Court held that new evidence, including the putative confession of the actual murderer, which was sufficient to get through the gateway, was not enough to overcome the burden for an actual innocence claim? How could some additional evidence here of changed science be sufficient? Well, two points in response, Your Honor. The first, in House v. Bell, I believe that the petitioner, there was still evidence supporting an inference of guilt. I believe he had blood on his pants, he had lied to the police, and he had taken inexplicably this walk about, I think, around 2 in the morning that he couldn't explain. He essentially told the police that he felt like going for a walk, and that was all. But don't you have a problem here that the nature of Punkett's expertise is questioned? You know, he's not a neurologist, he's not an expert in all areas, and he concedes that. And there was a finding that his expertise was not in all of the necessary areas so that it should be counted as controlling, if you will. As long as you have those other experts did opine, and we have no reason to believe that they would change their opinions, that's why I asked you if the government had conceded that its experts were wrong, then don't we have the same lack of probability that existed in House v. Bell? Plus the testimony of April and Tina Reese, separate aside from the medical evidence at the trial. Yeah, you're left with all the other evidence in the case, even if you shake the expert opinion here, right? Well, I'm not aware of Tina Reese implicating Mr. Wright in committing the crime whatsoever. April Donovan's mother did testify as a cooperating witness. I take it the answer to my question is yes. You're left with whatever all the other evidence is. Sorry, Your Honor. That's correct, but that evidence is essentially worth nothing, right? There was evidence taken at trial that Donovan was harmed at some point or suffered an impact injury weeks before May 12. And evidence of your client's access to the child during certain relevant periods of time. He was the father, Your Honor, that's right, but he had access to the child since the child birth. In fact, exclusive access during some periods of time, right? Well, that's right, but including the period of time before Donovan purportedly suffered any injury. Wasn't there evidence his wife was asked if she originally thought the other, is it Will? That's right, Wanda Will, that's correct. And then, without objection, she was asked, you know, and who do you now think did it? She said, my husband. OMG. That's exactly the point, Judge Randall. So she was a cooperating witness who had told the police on multiple occasions before she was charged with capital murder that she thought Wanda Will or one of her boys, and we heard testimony that her boys were incredibly violent, that she was the one or one of her boys that harmed Donovan because Wanda Will also had access to Donovan and exclusive access, and she would watch him for long periods of time while Donovan worked. Well, excuse me, while Mr. Wright worked. He had a full-time job, so he was often at work. But isn't that where Tina's testimony comes into play, that while at the homeless shelter, he seemed to be a healthy and normal baby, and it was only after they moved into the apartment together where your client then had access in a much more sustained way that these injuries began to manifest themselves. It's circumstantial, but when you have that plus the other medical evidence on the record, how do you get over the extremely high threshold that the court has set for an actual innocence claim if one even exists? Well, allow me to attempt to persuade you that the medical evidence that was put on a trial in 1998 is essentially worthy of no credence whatsoever. Wait a minute. Didn't Dr. Adams and Dr. Liesma, I think it is. That's right. They made many of the same points at trial that Dr. Plunkett subsequently makes. Well, they made similar points as to the mechanism of the injury, but critically they left the door open for Donovan being injured on May 12th. Dr. Adams or Dr. Liesma said, well, he couldn't rule the possibility out. Dr. Adams, I believe, testified, actually I have this here, that Donovan suffered a blunt force head trauma sometime within two days before Donovan was seen at Hanover Hospital. That's A774 and A777. How does your evidence from Dr. Plunkett do anything more other than at best provide a jury with alternate explanations as to what happened? And if that's all, that doesn't even come close to reaching the very high burden that you have to meet here for an actual innocence claim, does it? I agree. If that's all Dr. Plunkett's testimony does, then the burden is not met. But Dr. Plunkett's testimony goes much further than that. What's the key aspect of his testimony? I mean, I'm looking at it and, you know, it says can do. It's not necessarily, I mean, I don't see anything that's absolutely conclusive. This isn't the sort of case where you have DNA evidence or something along those lines, and that's because the Commonwealth's case was entirely circumstantial. And without the testimony of their testifying experts, Mr. Wright would not be in prison today. Now, to the key points of Dr. Plunkett's testimony, I would direct the court to A1127, where Dr. Plunkett testified, and I'm quoting, there's no evidence that Donovan suffered an injury on May 12th. And because of that, Donovan suffered no injury that day. He said there can be rebleeds with little to no additional trauma. There can be. That's right. That's exactly right. But one does not go to prison for 20 to 40 years for a bump on the head, right? It's just fundamentally unreliable, this evidence, that because there were rebleeds in different locations, that there was trauma on May 12th. We now know, based on current medical understandings, and this isn't just Dr. Plunkett's testimony. There's been a fundamental change in scientific understanding as to this specific aspect of the injury, and now it's widely acknowledged that rebleeds happen, and not only do they happen with little or no trauma, but they happen in areas completely separate from areas of prior trauma. So if you take away May 12th, you perhaps are not pointing the finger quite as directly to Mr. Wright, but you have lots of suspects, but you don't have a probability that he's innocent, do you? I think we do, Your Honor, and the reason for that is because if we take away the injury on May 12th, any inference which was reasonable that Mr. Wright harmed Donovan on those previous occasions when Donovan suffered a skull fracture, for example, becomes pure speculation. If Mr. Wright didn't harm Donovan on May 12th, then we look at the other testimony. Mr. Wright was not implicated by any of the other witnesses in any way, aside from Donovan's mother, who without reason whatsoever said, well, I think Mr. Wright did it. I agree there should have been an objection there. She provided no basis for that opinion whatsoever, and of course that was incredibly prejudicial to Mr. Wright. It is interesting that the evidence in the case is so circumstantial. I agree. I agree, Your Honor, and I see I'm out of time. I'm happy to take this up under rebuttal as well. All right. We'll hear from you under rebuttal. Thank you. And by the way, thank you for taking this case. We really appreciate your work on behalf of your client. My pleasure. Thank you, Your Honor. Good morning. May it please the Court, my name is James Amkatovich. On behalf of the appellees, Gentleman Rosen, Commonwealth of Pennsylvania, York County District Attorney's Office. Your Honors, in reviewing this case for the oral argument, it's become clear that a key framing issue has been glossed over. This in part is due to the background of this case. It was a pro se habeas petition, not well framed. We responded, basically responded to the issues as they were raised. But the defendant was convicted of third degree murder, not murder in the first degree. The Commonwealth's theory at trial was a murder in the first degree case. However, because he was convicted of murder in the third degree, that completely changes the nature of the Commonwealth's burden of proof as to that charge. The Commonwealth's burden of proof? As I recall, I'm not sure where you're going with this. As I recall, the homicide, criminal homicide section of the Crimes Code, third degree murder is every other, something in the nature of every other form of homicide. But when it comes to a case where it's an infant victim who has died as a result of parental neglect or attack, a third degree murder conviction can be sustained by a failure to provide sufficient care for a child's needs, resulting in death. This is pursuant to Commonwealth v. Kellam, 719A2D792, Pennsylvania Superior Court, 1998. In this case, if the Court were to look at Dr. Plunkett's testimony, his arguments that the defendant didn't cause, specifically, directly cause the injuries, and that these injuries had existed over a long period of time, they were severe injuries, the fact that the defendant and the defendant's, the baby's mother, the defendant's paramour, the fact that the two caregivers did not get the infant the necessary medical care, that alone sustains the Commonwealth's burden and would turn Dr. Plunkett's testimony into inculpatory evidence towards the charge for which she was actually convicted. But that's not how the Commonwealth tried the case, is it? No, your mustered expert witnesses to try to show that this was a battered child. The Commonwealth argued that the defendant was the one that actually delivered the final blow, and we had argued for first degree murder. The jury rejected the Commonwealth's argument for first degree murder. So you're saying that if you're looking at actual innocence, it has to be actual innocence of something much less than direct causation of the death? In this case, yes, Your Honor. What's second degree? What's first and second? Well, first would be? First would be intentional murder. Second degree is a felony murder. Third degree is any other murder. But for a murder of someone, for instance, the case I cited, the Commonwealth v. Kellum, a mother actually left the child in the custody of a stepfather who did not actually have a direct custodial duty other than the fact that she was supervising the child for the day in question. So is your suggestion that we don't know what the jury's basis was, that the jury might have found anything in the nature of even negligent care of this child while the defendant had custody? It would be more than negligence. It would have to be. Raising up to the level of recklessness for not taking the child to receive medical care, and this is actually corroborated by the defendant's own testimony where he had actually seen the child seize up and seen blood in the child's eyes on various occasions prior to the final day where the final injury had been incurred. The mother pled guilty to? She pled guilty to involuntary manslaughter, which is a lesser-included offense, with an agreement that she would testify against Mr. Wright. Why wasn't this argument raised in the State's brief, and what are we to do with the fact that we're hearing it for the first time in oral argument? Well, the fact that the defendant was convicted of third-degree murder is contained in both briefs. It's conceded by defense counsel in the briefs. The main issue is the manner in which these cases were argued. It's been hard for the Commonwealth to pin down what approach they're taking, as the Commonwealth noted in its brief. The issue of Dr. Plunkett's testimony was raised under specific case theory at the PCRA hearing, and from our point of view at the original habeas petition, it was a re-argument that the court's ruling in the PCRA petition was incorrect. When the certificate of appealability had been issued? Excuse me. Initially, at the first PCRA hearing, the issue raised by petitioner was really one in the nature of after-discovered evidence, wasn't it? In regards to Dr. McManaway's prior testimony, yes. The second PCRA hearing was a new evidence claim that was ruled upon by Judge Orr factually that the evidence did not constitute new evidence. But there was not a pure, actual innocence claim, just a new evidence claim, which is a slightly different standard under Pennsylvania law as opposed to a pure, actual innocence claim. Is this case like Han Tak Lee, such that the original evidence is so unreliable as to give rise to a due process claim? I don't believe it was, Your Honor. In this case, we had several experts, the emergency room physicians, the x-ray technicians and experts, the experts from the Mission Mechanics Center. None of them pointed to Wright, did they? None of them could say that Mr. Wright was the only person that did the offense. But they did say it happened on that day. They put the timing for the final blow in such an area that it could only be Mr. Wright or Mrs. I apologize, the baby's mother, April Kleindienst. The jury did have an opportunity to hear from April Kleindienst, and I apparently found her credible in her claims that she was not the person that delivered the final blow. She didn't say anything negative about her husband. There's not one shred of evidence that he had any violent streak whatsoever, or that anyone had ever seen him do anything vis-a-vis that child that would let you infer that he did all these things. That's correct, Your Honor. And if we had convicted him of the first-degree murder, that would become more of an issue. However, in light of the fact that the jury found him not guilty of first-degree murder and only found him guilty of the third-degree murder, that's where the failure to take the child in and have him treated becomes an issue. What was his sentence? He received a 20 to 40-year sentence. That is not a mandatory sentence, Your Honor. That was a judge's opinion as judicial opinion. That's a lot for reckless endangerment. This was a reckless endangerment resulting in death. If the juvenile had survived, it's likely he would have been subject to just endangering the welfare of a child, which has a misdemeanor one, a much lighter sentence. And what did she get? I believe she received... Only a couple of years, I think. I can't say for certain, Your Honor. I believe we have it in our briefs, but I don't have that handy. If we focus on the arguments that were raised in the briefs, one is about whether there were such changes in the science and there was enough new science that was presented that the decision of the state court was contrary to or involved in unreasonable application of clearly established federal law. What do we do with the fact that Dr. Plunkett did rely on 36 new sources seeming to point to significant changes in the science that weren't available at the time of trial? Well, as Judge Ewer found in the PCRA hearing, Dr. Plunkett had, in the majority of his argument, relied upon scientific journals that had actually been available at the time of trial and also at the time of Dr. McManoway's first PCRA involving Dr. McManoway. Your colleague suggested only 10 of the 46 articles were ones that predate a trial, that the others, 36 of 46, were much more recent. Are you disputing that? I really don't have any way to dispute that particular detail, Your Honor. Dr. Plunkett's testimony was focused upon the ophthalmological evidence. Dr. Plunkett was never admitted as an expert in other fields other than ophthalmology and pathology. So the corroborating testimony that was provided by the emergency room physician as to the relative time of death and by the other experts, Dr. Ross and the expert regarding CAT scans, that testimony is not implicated by Dr. Plunkett as he did not, he admitted, Judge Orr, that he did not even review their testimony when he was rendering his opinion. The fact that Dr. McManoway's testimony could be altered by Dr. Plunkett's testimony, rebutted by Dr. Plunkett's testimony, that would become an issue for the fact finder to determine which one they believed. And as I said, if this were a murder in the first degree, where we would need to show he took the affirmative act of choosing to murder the child, then this becomes a stronger case for the appellant. But since this is a murder in the third degree, which would be sustained if he had filed a sufficiency of the evidence claim. We reviewed that. Now, it's part of the other reason why this apparently did not come up previously. We reviewed the direct appeal, and sufficiency was never raised. There were, I believe, ten issues that were raised on direct appeal, but sufficiency was the one I want, which is part of the reason why the framing of this is a bit off. All right. I have no additional... All right. Thank you very much. Thank you. We'll hear from counsel in rebuttal. And by thanking you, I intended to thank you for taking this pro bono, and also your brief was excellent. Oh, thank you, Your Honor. Thank you. I have to admit I'm caught a bit unawares by the Commonwealth's argument. Well, it makes four of us, I think. I'm glad I'm not the only one. I would argue that since this was raised for the first time in our argument, that argument is waived. I think an important point to rebut what the Commonwealth is saying is by what Judge Rendell pointed to was the sentence that Mr. Wright received. And I believe, and I would have been more prepared if I knew this was coming up, but I believe the trial court judge referenced something along the lines of the heinous nature of the crime, warranting 20 to 40 years. That's not a reckless endangerment statement. I would also add that the probation officer recommended that Mr. Wright receive 10 years. And Judge O'Leary, as is his want, made a different decision on that point. Is 20 to 40 the maximum? I've forgotten maximums. That's a maximum sentence. That was my answer. Which, again, supports the assertion that the concern here wasn't reckless endangerment. Again, it was that Mr. Wright intentionally harmed this child in such a way that the child died. As to Han Tockley, Your Honor, I think it's an incredibly important opinion for this case because it provides a path for relief in one of two ways. The first is that it supports the proposition that habeas relief is warranted where scientific evidence supporting the prosecution's case is now known to be fundamentally unreliable. Yeah, and I think that's fundamentally unreliable, and that's the issue. Does Plunkett's new version of what could have happened, does it render all the other evidence? And didn't Adams, didn't two of, there was a finding that the two of the experts were similar to what Plunkett was saying? Adams and what's the other one?  That's correct, Your Honor. And that's one of the grounds under which we argue that the state court erred. And our clear and convincing evidence in support of that argument is that both Adams and Leisman did leave the door open that Mr. Wright harmed Donovan on May 12th, whereas Dr. Plunkett closed that door conclusively. And once that door is closed, any inference as to whether Mr. Wright harmed Donovan at an earlier date becomes utter speculation. And not only that, the testimony pointed to other suspects, but not to Mr. Wright, once you remove May 12th as a possible date of injury. One additional point with Hantock-Lee, I want to point out that, and this is mentioned in our reply brief, that the certificate of appealability in Hantock-Lee had to do with a freestanding claim of actual innocence. The court proceeded under a due process analysis, focusing on the fundamental unreliability of the evidence, and finding that if that evidence was unreliable, then continued incarceration is a due process violation. And I would say that's exactly what happened in this case. Rendering the actual innocence claim to be a gateway to the due process claim? That was. Making it kind of easier, if you will? I've struggled with this mightily. It's fairly confusing, but it was not a gateway claim. That was their substantive claim, was they were proceeding under actual innocence. But in a situation where you have a circumstantial case, and you have scientific testimony that forms the entire foundation of that conviction, if that testimony then becomes fundamentally unreliable, habeas relief is warranted. And that's true whether it's framed as a freestanding claim of actual innocence or as a due process violation. Thank you. Thank you very much. The case is well argued. We'll take it under advisement. Thank you.